RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0307p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 08-5993

DONALD GRAHAM,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 06-00095-002—Danny C. Reeves, District Judge.

Argued: January 22, 2010

Decided and Filed: September 21, 2010

Before: MERRITT, MOORE, and GIBBONS, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Timothy J. McKenna, LAW OFFICE OF TIMOTHY J. McKENNA, LLC, Cincinnati, Ohio, for Appellant. Andrew Sparks, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Timothy J. McKenna, LAW OFFICE OF TIMOTHY J. McKENNA, LLC, Cincinnati, Ohio, for Appellant. Andrew Sparks, James E. Arehart, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which GIBBONS, J., joined. MERRITT, J. (pp. 27-36), delivered a separate dissenting opinion.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Donald Graham, convicted of three counts of a seven-count indictment for crack-cocaine offenses under 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2, appeals from the district court's denial of his

Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal, denial of his motion to disregard life sentence, and sentencing decision. Graham's main contention on appeal is that his life sentence, imposed for his third qualifying felony under 21 U.S.C. § 841(b)(1)(A), violates the Eighth Amendment to the U.S. Constitution. Finding no reversible error, we affirm the district court's rulings on Graham's motions and his life sentence.

Graham was arrested as part of an investigation conducted by the Northern Kentucky Drug Strike Force ("NKDSF") and the Kenton County Police Department ("KCPD"). Starting in September 2006, the NKDSF and the KCPD began a series of six controlled cocaine-base buys with a confidential informant to investigate the confidential informant's tip that Jermaine Goodwin was a drug supplier.[1] The first four controlled buys occurred at various locations in northern Kentucky where the confidential informant was located. The last two controlled buys, on October 16 and 17, 2006, occurred at Goodwin's residence in northern Kentucky. On each of these days, Goodwin told the confidential informant when he arrived that the drugs were on their way. Graham then arrived and went with Goodwin to the back area of Goodwin's apartment (a bedroom), after which Goodwin returned to the living room with the drugs to complete the deal with the confidential informant. Following this sequence of events on the second day, October 17, the police stormed the apartment to execute a search warrant. Graham, Goodwin, and William Corey Howard, Graham's traveling companion on October 17, were all arrested and charged as co-defendants in a ten-count indictment.

Both Goodwin and Howard pleaded guilty under plea agreements requiring them to testify in Graham's trial. After a three-day trial, the jury convicted Graham of the three counts pertaining to him: Count One, conspiring with Goodwin, Howard, and others to distribute and possess with intent to distribute in excess of fifty grams of cocaine base (21 U.S.C. §§ 841(a)(1), 846); Count Six, distribution of greater than five

---

[1]We present a more developed statement of the facts of Graham's instant crime and sentencing where relevant to our analysis below. For present purposes, a summary will suffice.

grams of cocaine base, and aiding and abetting Goodwin, Howard, and others in this distribution (21 U.S.C. § 841(a)(1); 18 U.S.C. § 2); and Count Seven, distribution of greater than fifty grams of cocaine base, and aiding and abetting Goodwin, Howard, and others in this distribution (21 U.S.C. § 841(a)(1); 18 U.S.C. § 2). The district court had denied Graham's Rule 29 motions for judgment of acquittal at the close of the government's case and at the close of all the evidence. With new counsel appointed for sentencing, Graham filed a belated motion for a new trial and a motion to disregard life sentence. The district court denied both motions and sentenced Graham on August 1, 2008, to concurrent terms of life imprisonment (the mandatory minimum for Counts One and Seven under § 841(b)(1)(A)) and 168 months of imprisonment (Count Six).

Graham timely appeals the denial of his acquittal and life sentence motions and challenges the reasonableness of his sentence.

## I. DISCUSSION

### A. Denial of Graham's Motion for Judgment of Acquittal

Graham argues that the district court erred in denying his acquittal motions because "No One Saw Graham Do Anything," making the government's evidence insufficient to support a conviction. Appellant Br. at 17. The district court denied Graham's motions on the record, stating, "A lot of the evidence is by people whose credibility isn't the greatest, but the Court has to ignore those issues, and the evidence taken at its face value is sufficient for it to go to the jury." Dist. Ct. Doc. ("Doc.") 125 (Trial Tr. #3 at 37, 56). We review de novo the denial of a motion for acquittal, viewing the evidence in "a light most favorable to the prosecution, giving the prosecution the benefit of all reasonable inferences from the testimony." *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir.), *cert. denied*, 552 U.S. 976 (2007). "The relevant question in assessing a challenge to the sufficiency of the evidence is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* We may not "weigh the evidence presented, consider the credibility of witnesses, or

substitute our judgment for that of the jury." *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999).

"A defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir.) (internal quotation marks and alteration omitted), *cert. denied*, 549 U.S. 976 (2006). We afford the same weight to both circumstantial and direct evidence. *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986). Because "'[c]ircumstantial evidence alone may sustain a conviction,'" physical evidence is not a prerequisite to sustaining a conviction. *United States v. Davis*, 306 F.3d 398, 408 (6th Cir. 2002) (quoting *United States v. Adams*, 265 F.3d 420, 423 (6th Cir. 2001)), *cert. denied*, 537 U.S. 1208 (2003). "Furthermore, it is well-settled that uncorroborated testimony of an accomplice may support a conviction in federal court." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir.) (citing, inter alia, *Krulewitch v. United States*, 336 U.S. 440, 454 (1949)), *cert. denied*, 528 U.S. 1033 (1999); *accord United States v. Owens*, 426 F.3d 800, 808 (6th Cir. 2005), *cert. denied*, 546 U.S. 1119 (2006). We may not rule on a challenge to witness credibility in reviewing the denial of a motion for acquittal because doing so "would invade the province of the jury as the sole finder of fact in a jury trial." *United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001) (internal quotation marks omitted). A defendant's attempt to attack witness credibility "simpl[y] challenges . . . the quality of the government's evidence and not the sufficiency of the evidence." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (internal quotation marks omitted).

Graham attacks all of his counts of conviction generally, arguing that there is no direct evidence tying him to Goodwin or the controlled buys because no one saw him with any drugs or marked money, and that Goodwin's statements about Graham are not enough. He does not attack specific elements of any of the counts of conviction, but rather points out broad problems with the government's evidence. Because the government must have presented sufficient evidence for each count of conviction such that a "rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt," *McAuliffe*, 490 F.3d at 537, we set forth the elements required for each count.

### 1. The Elements Required for Conviction

#### a. Count One

To uphold a conviction on Count One, conspiracy to distribute and possess with intent to distribute, the jury must have found that the government proved beyond a reasonable doubt:

> (1) an agreement by two or more persons to violate the drug laws, (2) knowledge and intent to join in the conspiracy, and (3) participation in the conspiracy. [*United States v. Salgado*, 250 F.3d 438, 446 (6th Cir.), *cert. denied*, 534 U.S. 916, 534 U.S. 934 (2001)]; *United States v. Elder*, 90 F.3d 1110, 1120 (6th Cir. 1996). . . . It is not necessary that the government prove a formal agreement, and the existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan. *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997). A conspirator need not be an active participant in every phase of a conspiracy, so long as he is a party to the general conspiratorial agreement. *Salgado*, 250 F.3d at 447. While mere presence at the scene would be insufficient to establish participation, a defendant's participation in the conspiracy's common purpose may be inferred from the circumstances as well. *Id.*

*Paige*, 470 F.3d at 608–09; *see also United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir.), *cert. denied*, 528 U.S. 1051 (1999). "A defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances," including a close relationship between alleged conspirators, but participation requires more than "mere association with conspirators." *United States v. Brown*, 332 F.3d 363, 372–73 (6th Cir. 2003) (internal quotation marks omitted). A buyer-seller relationship with others is not enough, but evidence of a conspiracy or evidence linking a particular defendant to a conspiracy may be provided by: repeated sales, *Brown*, 332 F.3d at 373 (holding regular arrangement to purchase large amounts is sufficient evidence of conspiracy); "further evidence indicating knowledge of and participation in the conspiracy," *Gibbs*, 182 F.3d at 422; *or* "evidence of a large quantity of drugs," *United States v. Caver*, 470 F.3d 220,

233 (6th Cir. 2006), *cert. denied*, 549 U.S. 1326, 549 U.S. 1353 (2007). "[O]vert acts are not needed to prove a conspiracy under § 846." *Gibbs*, 182 F.3d at 420.

### b. Counts Six & Seven

"[A] violation of 21 U.S.C. § 841(a), distribution of cocaine, requires that a defendant: (1) knowingly or intentionally distribute cocaine, and; (2) at the time of such distribution the defendant knew that the substance was cocaine." *United States v. Colon*, 268 F.3d 367, 376 (6th Cir. 2001). Counts Six and Seven also charged Graham under 18 U.S.C. § 2 for aiding and abetting another to violate 21 U.S.C. § 841. "[T]he essential elements of aiding and abetting are (1) an act by the defendant that contributes to the commission of the crime, and (2) an intention to aid in the commission of the crime." *Davis*, 306 F.3d at 412. "To prove that [Graham] aided and abetted the drug transactions under 18 U.S.C. § 2, the government must establish that [Graham] participated in the venture as something []he wished to bring about and sought to make succeed." *United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999), *cert. denied*, 538 U.S. 1118, 529 U.S. 1028 (2000); *see also Paige*, 470 F.3d at 609; *Salgado*, 250 F.3d at 447; *United States v. Nieto*, 226 F. App'x 483, 488 (6th Cir. 2007) (unpublished opinion). The government was not required to prove that Graham himself actually distributed or had possession of the cocaine, only that he had knowledge of the principals' actions and assisted. *Paige*, 470 F.3d at 609.

### 2. The Evidence Presented at Trial

We conclude that the government presented sufficient evidence to support the jury's verdict as to all counts. In response to Graham's insufficient-evidence challenge, the government relies upon Goodwin's testimony regarding Graham's repeated involvement as a supplier and other witnesses' corroborating testimony. As stated above, we may not review Goodwin's credibility, and Goodwin's testimony alone may support Graham's convictions if the testimony was enough to prove Graham's involvement beyond a reasonable doubt. *See Spearman*, 186 F.3d at 746 (upholding conviction on sufficiency challenge based on one co-conspirator's testimony); *Gibbs*,

182 F.3d at 425 (upholding convictions on sufficiency challenges where only one eyewitness testified as to defendant's involvement, but government cited multiple corroborating witnesses); *Nieto*, 226 F. App'x at 487–89 (upholding conviction for aiding and abetting distribution and for active participation in conspiracy based on co-conspirator's testimony and evidence of defendant's indirect participation); *see also United States v. Henley*, 360 F.3d 509, 513–14 (6th Cir. 2004) (upholding conviction on sufficiency challenge based on testimony of two co-conspirators).

At trial, the confidential informant, Shawn Payne, testified that Goodwin told him when they first met in the fall of 2006 that Goodwin "basically had a hookup on narcotics," and that the first controlled buy was set up the very next day. Doc. 124 (Trial Tr. #2 at 56). Goodwin never told Payne the identity of his supplier, and Payne never saw or knew of Graham until October 16. *Id.* at 76–78. Goodwin testified that he had been obtaining drugs as a middleman from Graham for three or four months prior to Goodwin's arrest on October 16 and that he had obtained drugs from Graham "like 20 times or so." Doc. 123 (Trial Tr. #1 at 21–24). Goodwin's fiance, Tasha Abney, testified that Goodwin would receive drugs from Graham as his supplier "[o]n a weekly basis" and that she had driven Goodwin to Graham's house on occasions when Graham did not bring the drugs to Goodwin. Doc. 124 (Trial Tr. #2 at 107–09). (She also confirmed on cross that she had stated that this happened "on about 20 occasions." *Id.* at 125.) Howard testified that he knew Goodwin only through Graham, and that he had dropped packages of cocaine off at Goodwin's apartment for Graham "three or four times," had driven Graham to Goodwin's apartment occasionally, and had been to Goodwin's apartment "nine to eleven times" since he met Goodwin "around April or May of '06." *Id.* at 146–48. On cross, Howard testified that Goodwin had stated that he also had another supplier. *Id.* at 154.

Goodwin testified that for each of the controlled buys on October 16 and 17, 2006, he called Graham to obtain crack cocaine to complete the sales and had to wait for Graham to arrive before he had the drugs to sell. Doc. 123 (Trial Tr. #1 at 26–30.) Because Graham did not testify in his own defense, Goodwin was the only person to

testify as to what happened in the back bedroom where Goodwin received the cocaine from Graham. Payne confirmed that Goodwin did not have the drugs when Payne arrived on October 16 or 17, but that he and Goodwin completed the deals after Graham arrived and went to the back area of the apartment with Goodwin. Doc. 124 (Trial Tr. #2 at 63–65, 66–71, 80–81). Abney also confirmed that on October 17 Goodwin was waiting for Graham to arrive with the drugs for Payne, and that she told Payne after Graham arrived that Graham was the supplier for whom they had been waiting. *Id.* at 113–14, 125. Howard testified that he drove Graham to Goodwin's on October 17 to drop off a package of cocaine. *Id.* at 149–50. Goodwin, Abney, and Howard each testified that they saw Graham throw down money when the police arrived on October 17. Doc. 123 (Trial Tr. #1 at 31, 59); Doc. 124 (Trial Tr. #2 at 127–30, 152).

Officer Scott Hardcorn testified that the NKDSF and the KCPD used a confidential informant to make six controlled buys from Goodwin, starting in September 2006 after the informant first told police about Goodwin and ending with the two controlled buys in question that directly involved Graham (one ounce on October 16 for $1,000 and three ounces on October 17 for $3,000[2]). Doc. 124 (Trial Tr. #2 at 4–5, 14–15). For the first four buys, Goodwin brought the drugs to the confidential informant at various locations in Kentucky, but the October 16 and 17 buys occurred at Goodwin's apartment. *Id.* at 5–8. Officer Hardcorn interviewed Goodwin after his arrest, and Goodwin told the officer that Graham had supplied the cocaine on October 16 and 17. *Id.* at 22. Officer Hardcorn testified that he did not actually know the origin of the drugs for the four previous controlled buys and that none of the baggies for any of the buys were ever tested for fingerprints. *Id.* at 24–25, 28–31, 40–41. Officer Andy Muse testified that on October 16 he saw Graham drive to and enter Goodwin's apartment after the confidential informant arrived and then leave before the informant, and that on October 17 he saw Graham once the police had entered Goodwin's apartment but had not observed Graham arrive. Doc. 123 (Trial Tr. #1 at 5–8, 12). Both officers testified that the confidential informant did not obtain the drugs on October 16 or 17 until after

---

[2]Agent Matthew Rolfsen testified that one ounce is approximately 28 grams. *See* Doc. 125 (Trial Tr. #3 at 8).

Graham arrived at Goodwin's apartment.  *Id.* at 5–9; Doc. 124 (Trial Tr. #2 at 17–19).

Officer Hardcorn also testified that he heard Graham's voice on the recordings from the

October 16 and 17 buys.  Doc. 124 (Trial Tr. #2 at 47).  Agent Matthew Rolfsen, an

evidence technician, testified about the evidence found at Goodwin's apartment and

identified buy money found on the floor.  Doc. 125 (Trial Tr. #3 at 12, 26–30).

Graham's trial counsel cross-examined each government witness about his or her

potential biases and credibility issues, and the district court instructed the jury about how

to utilize co-conspirator and paid-informant testimony during Goodwin's testimony and

after Payne testified, respectively.  *See* Doc. 123 (Trial Tr. #1 at 34); Doc. 124 (Trial Tr.

#2 at 98).  Graham stated on the record, outside the jury's presence, that he understood

his right to testify and that he did not want to testify.  Doc. 125 (Trial Tr. #3 at 55–56).

From our review of the entire trial transcript, we conclude that there was

sufficient evidence, viewed in the light most favorable to the government, from which

a reasonable jury could have found the essential elements of Counts One, Six, and Seven

beyond a reasonable doubt.

**B.  Denial of Graham's Motion to Disregard Life Sentence**

**1.  Impact of *United States v. Hill***

We review de novo a constitutional challenge to a sentence.  *United States v.

Jones*, 569 F.3d 569, 573 (6th Cir. 2009).  Graham argues that the district court erred

because his sentence, pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), is grossly

disproportionate under the Eighth Amendment as a result of an over-stated criminal

history and in comparison to his co-defendants' sentences.[3]  Graham acknowledges this

---

[3]In his motion, Graham's counsel conceded that Graham had at least two prior felony drug offenses and that the time period to collaterally attack those had passed under 21 U.S.C. § 851, but argued that the district court should apply a California district court's reasoning to reject the mandatory life sentence as arbitrary, disproportionate, and likely unconstitutional as a violation of the Eighth Amendment, Due Process Clause, and separation of powers concerns.  Doc. 130 at 235–37 (Mot. to Disregard); Doc. 149 at 315–20 (Supplemental Mem. in Support).  Counsel argued for a 168-month sentence, "a sentence that is proportional to the conduct of the co-Defendants, Goodwin and Howard."  Doc. 130 at 237.  On appeal, Graham has not reasserted his Due Process Clause or separation of powers arguments, which raised facial and as-applied challenges to the use of mandatory minimums under the Guidelines.  The district court did not address these arguments in its first order related to this motion, *see* Doc. 150 (July 31, 2008 Order at 2 n.2), but the court did reject these arguments, facially and as applied, on the record after

court's decision in *United States v. Hill* that mandatory minimum sentences under 21 U.S.C. § 841(b)(1)(A)(iii) do not constitute cruel and unusual punishment. *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir.), *cert. denied*, 513 U.S. 943, 513 U.S. 1025 (1994). *Hill* confirmed that this court adheres to the Supreme Court's "'narrow proportionality principle'" announced in *Harmelin v. Michigan*, 501 U.S. 957 (1991), stating that "the Eighth Amendment only prohibit[s] 'extreme sentences that are "grossly disproportionate" to the crime.'" *Hill*, 30 F.3d at 50 (quoting *Harmelin*, 501 U.S. at 995–97, 1001); *Harmelin*, 501 U.S. at 994–95 ("Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense . . . ."). Graham attempts to distinguish *Hill* on the grounds that his sentence "was triggered by an over-represented criminal history" rather than just the statute, and that the government did not present direct evidence that he "possessed anything." Appellant Br. at 23. These arguments do not distinguish *Hill*. To uphold a mandatory life term without parole for a third-time felony conspiracy-to-distribute offender responsible for 177.8 grams of cocaine base, *Hill* relied upon *Harmelin*, in which the Supreme Court upheld the same sentence for a first-time felony possession offender with 650 grams of cocaine. *Hill*, 30 F.3d at 50–51. The *Hill* court neither considered the impact of the defendant's two prior qualifying felonies, except to note that they existed, *id.* at 49, nor remarked on whether the defendant "possessed anything,"[4] *id.* at 49–51.

We have repeatedly rejected claims similar to those that Graham raises. *Caver*, 470 F.3d at 247 (rejecting as meritless any Eighth Amendment claim that fails to distinguish *Hill*). The fact that Graham's current felony conviction is for conspiracy to distribute in excess of fifty grams[5] does not distinguish his case. *See Hill*, 30 F.3d at

argument at the sentencing hearing, Doc. 160 (Sent. Tr. at 7–17). The Ninth Circuit has vacated the district court opinion upon which Graham relied. *United States v. Grant*, 524 F. Supp. 2d 1204 (C.D. Cal. 2007), *vacated in part*, 312 F. App'x 39 (9th Cir.), *cert. denied*, 130 S. Ct. 370 (2009).

[4]The *Hill* court did compare the drug quantity for which the defendant, Hickey, was found responsible under the conspiracy-to-distribute charge to the drug quantity in the *Harmelin* possession charge, *Hill*, 30 F.3d at 51, but the court did not discuss (even in the fact section) whether Hickey was found to have possessed any part of the drug quantity involved.

[5]The PSR stated that the conspiracy involved between 150 to 500 grams of cocaine base and used this amount under the relevant-conduct provision to determine Graham's base offense level. PSR at ¶¶ 25, 29, 35.

50–51 (same crime, with statement that defendant was responsible for 177.8 grams of cocaine base); *see also Jones*, 569 F.3d at 573–74 (rejecting, under *Hill,* claim that ten-year mandatory minimum under § 841(b)(1)(A)(iii) for one count of possession with intent to distribute over fifty grams of cocaine base was grossly disproportionate); *United States v. Thornton*, No. 08-3349, 2010 WL 489508, at *4 (6th Cir. Feb. 10, 2010) (unpublished opinion) (citing cases and rejecting challenge because defendant's circumstances "(including the 72 kilograms of cocaine) are in line with these cited cases" and "there is no reason to depart from our settled precedent"); *United States v. Nichols*, No. 99-3108, 2000 WL 923807, at *2 (6th Cir. June 29, 2000) (unpublished opinion) (relying on inability to distinguish *Hill* to reject claim for third felony drug conviction of possession with intent to distribute 234.75 grams of crack).

Graham's argument that his criminal history is "overrepresented" is more troublesome.[6] We have previously rejected the argument that the sentencing court should have been able to consider mitigating factors related to the prior felony convictions utilized as § 841(b)(1) predicates. *See Jones*, 569 F.3d at 574 (rejecting argument that defendant with only one criminal-history point should not have received statutory mandatory minimum, referencing first-time felon in *Harmelin*). The *Harmelin* Court specifically rejected the defendant's argument that a court must consider mitigating factors before imposing a statutory mandatory minimum. *Harmelin*, 501 U.S. at 994–95 (rejecting argument that the defendant's lack of prior felonies should have mitigated against imposing statutory mandatory minimum of life without parole based on asserted need to determine individually whether punishment is appropriate under Eighth Amendment). As "[w]e have held, . . . there is no constitutional right to individualized sentencing in non-capital cases." *United States v. Odeneal*, 517 F.3d 406, 415 (6th Cir. 2008); *see also United States v. Jones*, 205 F. App'x 327, 336–37 (6th Cir. 2006) (unpublished opinion) (rejecting argument that § 841(b)(1)(A) creates grossly

---

[6]Because Graham's trial counsel conceded that Graham could not collaterally attack his prior felony convictions under the period of limitations in § 851, *see* Doc. 160 (Sent. Tr. at 4–5), we have construed this *Hill* argument as claiming that the district court should have been able to consider the circumstances of his criminal history as mitigating factors. We consider the greater implications of Graham's earliest prior felony conviction below.

disproportionate sentences because the statute does not distinguish between prior possession-only felonies and more serious trafficking felonies), *cert. denied*, 551 U.S. 1109 (2007). "[T]here is no doubt that Congress has authority to limit judicial discretion, or even eliminate it altogether, by imposing mandatory minimum sentences." *United States v. Wimbley*, 553 F.3d 455, 462–63 (6th Cir.), *cert. denied*, 129 S. Ct. 2414 (2009). Under *Hill* and *Harmelin*, we must conclude that the district court did not violate the Eighth Amendment in rejecting the arguments Graham advanced in his motion to disregard life sentence.[7] However, the particular circumstance of Graham's earliest-in-time prior felony drug conviction presents a separate question.

## 2. § 841(b)(1) "Prior Convictions for a Felony Drug Offense": Committed as a Juvenile, but Convicted and Sentenced as an Adult

Graham has only two prior felony drug convictions, both of which the district court counted as triggering offenses for the § 841(b)(1)(A)(iii) mandatory life sentence. In 1995, when Graham was seventeen, he pleaded guilty under an indictment charging him *as an adult* for two counts of aggravated drug trafficking under Ohio law, and he was sentenced (in 1996, but while still age seventeen) to one year of imprisonment. Two years later, when Graham was nineteen, he was sentenced to two consecutive six-month terms of imprisonment for two counts of trafficking in cocaine under Ohio law. Graham's counsel at sentencing in the instant case did not present much of an argument to contest the district court's ability to consider Graham's 1995 aggravated trafficking conviction as a triggering offense for § 841(b)(1)(A)(iii) sentencing purposes.[8] And

---

[7]Although our conclusion that Graham's sentence is not grossly disproportionate obviates the need to reach Graham's comparative proportionality allegations, *Jones*, 569 F.3d at 574 (citing *Harmelin*, 501 U.S. at 1005), we would reject this argument under precedent. *See Odeneal*, 517 F.3d at 414–15 (rejecting similar claims under *United States v. Layne*, and distinguishing between codefendants); *United States v. Layne*, 324 F.3d 464, 474 (6th Cir.) ("This Court has agreed [with the Supreme Court] that comparative proportionality is not constitutionally mandated."), *cert. denied*, 540 U.S. 888 (2003).

[8]In the motion to disregard mandatory life sentence, Graham's counsel "concede[d] that the presentence report is correct in showing at least two previous felony drug offenses" and "concede[d] that pursuant to 21 U.S.C. Section 851, the period of limitations has expired for collateral attack on those convictions." Doc. 130 (Mot. to Disregard at 2). Counsel "note[d] that on the initial conviction, the Defendant was a juvenile and under applicable federal law, juvenile convictions are typically not counted as prior felony convictions." *Id.* at 3. But counsel did not challenge whether the 1995 conviction qualified under § 841, arguing instead that "this Court is presented with the Hobson's choice of imposing a mandatory life sentence on a Defendant with two prior drug convictions that together required the

Graham's arguments on appeal focused on the district court's ability to utilize for mitigation the minor nature of his two prior felonies and the fact that they occurred over ten years prior to the sentencing in this case. But at oral argument the focus shifted to whether § 841(b)(1)(A)(iii) supported the district court's ability to consider in the § 841(b)(1)(A)(iii) calculus a conviction stemming from a juvenile action treated as adult for prosecution and sentencing purposes under state law, and further whether this practice is constitutional under the Eighth Amendment.

Because Graham failed to raise this constitutional challenge before the district court, we review only for plain error.[9] *See United States v. Oliver*, 397 F.3d 369, 377 (6th Cir. 2005); *United States v. Murillo-Monzon*, 240 F. App'x 43, 46 (6th Cir. 2007) (unpublished opinion), *cert. denied*, 552 U.S. 1104 (2008). "To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, *i.e.*, obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Blackwell*, 459 F.3d 739, 771 (6th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 549 U.S. 1211 (2007). We have

---

Defendant to serve two years in prison; were imposed over 10 years ago and are clearly disproportionate to the life sentence urged as mandatory by the presentence report in this case." *Id.* The district court accepted Graham's concession and rejected Graham's contention that his 1995 conviction could be considered a juvenile adjudication because "as the Presentence Investigation Report indicates, while Graham was initially charged as a juvenile, he was prosecuted and sentenced as an adult. Such treatment forecloses any argument that this conviction should be ignored under § 841(b)." Doc. 150 (Dist. Ct. Op. at 4). At the sentencing hearing, Graham's counsel reiterated that Graham "objects to the two previous felony convictions that are in the [PSR]" but that "as I've indicated, I have not seen any basis that would allow me to move the Court to disallow or disregard those." Doc. 160 (Sent. Tr. at 4).

[9]We conclude that we may review this claim because Graham "simply failed to raise this issue [in this posture] below, and took no affirmative steps to voluntarily waive his claim." *United States v. Branham*, 97 F.3d 835, 842 (6th Cir. 1996). Graham thus forfeited his right to full appellate review of this claim, but we may review it for plain error. *United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make a timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))); *see United States v. Goodman*, 519 F.3d 310, 319 (6th Cir. 2008) ("It is true that a defendant may waive objections if he intentionally relinquishes or abandons a known right. In particular, we agree . . . that an attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." (internal quotation marks and alterations omitted)); *United States v. Blackwell*, 459 F.3d 739, 770–71 (6th Cir. 2006) (reviewing defendant's constitutional claim for plain error when he failed to raise it in challenging his fine but did challenge the fine on other grounds), *cert. denied*, 549 U.S. 1211 (2007); *cf. United States v. Smith*, 252 F. App'x 20, 31–32 (6th Cir. 2007) (unpublished opinion) (holding that failure to challenge whether prior felony drug offense qualified for § 841 mandatory life term, and explicit concession at sentencing that it did qualify, amounted to waiver precluding appellate consideration), *vacated on other grounds for different defendant by Townsend v. United States*, 128 S. Ct. 2485 (2008).

held that "unconstitutional enhancements of sentences" affect substantial rights. *United States v. Milan*, 398 F.3d 445, 452 (6th Cir. 2005).

We address the statutory challenge first, and we conclude that the statutory language supported the district court's ability to count Graham's juvenile-age conviction as a § 841(b)(1)(A)(iii) prior conviction. Section 841(b) provides in relevant part:

> If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence.

21 U.S.C. § 841(b)(1)(A). The Supreme Court has held that the definition of "felony drug offense" in 21 U.S.C. § 802(44) controls as the "exclusive[]" definition for purposes of § 841(b)(1)(A). *Burgess v. United States*, 553 U.S. 124, 127 (2008). Although the *Burgess* Court decided this issue in reference to the twenty-year mandatory-minimum provision, § 841(b)(1)(A) uses the same language in both the twenty-year and the life-term mandatory-minimum provisions. *See id.* (rejecting argument that sentencing courts should defer to state-law crime definitions). Under § 802(44), "[t]he term 'felony drug offense' means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802. This circuit used § 802(44) to define "felony drug offense" in § 841(b)(1) for purposes of the mandatory life term even before the Supreme Court decided *Burgess*.[10] *United States v. Spikes*, 158 F.3d 913, 931–32 (6th Cir. 1998), *cert. denied*, 525 U.S. 1086 (1999); *id.* at 932 ("[Section] 802(44) only requires that the state statute criminalize conduct 'relating' to drugs. The use of the expansive term 'relating' as the only substantive limitation on the reach of the statutory phrase 'felony drug offense' clearly indicates that the statute encompasses drug offenses that involve the simple possession of drugs.").

---

[10]This court has since cited *Burgess* in unpublished opinions for § 841(b)(1) definitions. *See United States v. Lockett*, 359 F. App'x 598, 602–03 (6th Cir. 2009) (unpublished opinion) (defining § 841(b)(1)(B)); *United States v. Young*, 347 F. App'x 182, 189–90 (6th Cir. 2009) (unpublished opinion) (defining § 841(b)(1)(A)).

Thus at the time of Graham's sentencing the district court was obligated to employ the § 802(44) definition of "felony drug offense."

However, whether a "prior conviction" stemming from a juvenile action, treated as adult for prosecution and sentencing purposes under state law, that qualifies as a "felony drug offense" under the § 802(44) definition qualifies as a "prior conviction" for § 841(b)(1)(A) mandatory minimum purposes remains an open question in this circuit. In *United States v. Young*, an unpublished decision, the defendant argued that such an offense could not qualify as a "prior conviction" under § 841(b)(1)(A), challenging one of his predicate state convictions used on the ground that he received it "just under a month before his eighteenth birthday." *United States v. Young*, 347 F. App'x 182, 189 (6th Cir. 2009) (unpublished opinion), *cert. denied*, 130 S. Ct. 1552, 130 S. Ct. 1554 (2010). However, the state had tried and convicted the defendant "as an adult." *Id.* The *Young* panel stated that *Burgess* controlled for its interpretation of § 841(b)(1)(A), and concluded:

> We do not need to decide whether Congress intended this provision to include convictions received by juveniles as a result of a juvenile adjudication. Young was convicted as an adult in an adult court. He was convicted of possessing drugs with the intent to distribute, and he was eligible for fifteen years in prison. Thus, he was convicted of a felony drug offense as defined by Congress.[11]

*Id.* at 190. In a footnote, the court rejected the defendant's argument that the Sentencing Guidelines, specifically U.S.S.G. § 4A1.2(c), indicate that juvenile convictions should not be considered as prior offenses. The *Young* panel stated that,

> putting to one side the difficulty of using a Guidelines definition to determine the meaning of a term used in a statute, Young overlooks the next subsection of the Guidelines. Section 4A1.2(d) provides that convictions for offenses committed prior to age 18 are considered in

---

[11]The Eleventh Circuit in an unpublished opinion has relied on the same rationale—that the defendant "was actually charged and convicted as an adult"—to reject a defendant's argument that a conviction at age nineteen that could have qualified for youthful-offender status under state law was not a triggering felony for § 841 under the Eighth Amendment. *United States v. Williams*, 364 F. App'x 546, 549 (11th Cir. 2010) (unpublished opinion).

> sentencing if the defendant was convicted as an adult, and received a sentence of imprisonment exceeding one year and one month.

*Id.* at 190 n.4.

For similar reasons, we conclude that the district court properly considered Graham's 1995 conviction in its § 841(b)(1)(A) mandatory-minimum calculus. Nothing in § 841(b)(1)(A) indicates that a defendant's age at the time of his or her prior conviction is relevant to the application of § 841, but to the extent that it is, age would appear to matter if it was related to the process in which a defendant's prior conviction was obtained. Here, according to the PSR, Graham "was initially arrested and charged as a juvenile, [but] he was prosecuted and sentenced as an adult." PSR ¶ 44. He was indicted by a grand jury on four counts of Aggravated Trafficking under Ohio law, a felony. He pleaded guilty to two counts of an amended charge of "Trafficking-Sale," a fourth-degree felony, in the Hamilton County Court of Common Pleas, and he was sentenced to one year of confinement for each count. *Id.* Graham's 1995 conviction thus meets the definition of a "felony drug offense" under § 802(44), "an offense that is punishable by imprisonment for more than one year under any law . . . of a State . . . that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."[12]    21 U.S.C. § 802.   Contrary to Graham's argument, we are bound to utilize the definition in § 802(44) as the exclusive definition for "felony drug offense" in § 841. *Burgess*, 553 U.S. at 127, 132–33. Moreover, the Supreme Court in *Burgess* stated that § 802(44) is not ambiguous and does not implicate the rule of lenity in its application. *Id.* at 135–36 (holding that Congress's express definition of "felony drug offense" "is coherent, complete, and by all signs exclusive" leaving "no ambiguity for the rule of lenity to resolve"). "Section 802(44)'s definition of 'felony drug offense' as 'an offense . . . punishable by imprisonment for more than one year,' in short, leaves no blank to be filled by § 802(13) or any other definition of

---

[12]Graham has never challenged whether his 1995 conviction technically met the "felony drug offense" definition based on the length of the potential term of imprisonment, and the PSR does not state the Ohio drug-trafficking law under which he was convicted. We presume that Graham was convicted of violating a provision of Ohio Revised Code Annotated § 2925.03 and that the state sentencing court had the discretion to sentence Graham to a term of imprisonment of more than one year. *See* OHIO REV. CODE ANN. §§ 2925.03, 2929.13(C).

'felony.'" *Id.* at 130.  The Court stated that "[b]y recognizing § 802(44) as the exclusive definition of 'felony drug offense,' our reading serves an evident purpose of the 1994 revision [to § 841]:  to bring a measure of uniformity to the application of § 841(b)(1)(A) by eliminating disparities based on divergent state classifications of offenses."  *Id.* at 134.  To have a "prior conviction" of a "felony drug offense" is not defined in § 841 or in § 802; "[w]hen a term is undefined, we give it its ordinary meaning."  *United States v. Santos*, 553 U.S. 507, 128 S. Ct. 2020, 2024 (2008).  BLACK'S LAW DICTIONARY (9th ed. 2009) defines "conviction" in part as "[t]he act or process of judicially finding someone guilty of a crime; the state of having been proved guilty," and as "[t]he judgment (as by a jury verdict) that a person is guilty of a crime."  WEBSTER'S THIRD INTERNATIONAL DICTIONARY (1986) defines "conviction" in part as "the act of proving, finding, or adjudging a person guilty of an offense or crime . . . ; *specif*:  the proceeding of record by which a person is legally found guilty of any crime esp. by a jury and on which the judgment is based."

Unlike the defendants in our sister circuits' cases addressing this issue,[13] Graham was not adjudicated in the juvenile system. Under Ohio law, a person who was a "child"—under age eighteen—at the time he or she committed an offense must be placed under the exclusive jurisdiction of the juvenile courts, but may be bound over to a court

---

[13]Our sister circuits confronting similar questions have produced opinions indicating that sentencing courts may utilize prior juvenile convictions for § 841(b)(1)(A) purposes. We cite these cases only as background in other circuits and do not evaluate or express our opinion regarding them.

In the most recent published decision, the D.C. Circuit held that a prior felony drug conviction that was "set aside" under the Federal Youth Corrections Act was still a countable prior conviction for a § 841(b)(1)(A) mandatory life term. *United States v. Law*, 528 F.3d 888, 910–11 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 1023 (2009). The court held that any policy reasons for setting aside a juvenile conviction—to give the offender "a fresh start"—were not sufficient to avoid the clear mandate of § 841(b). *Id.* "For purposes of sentences imposed under § 841, however, Congress has not exempted from the 'prior convictions' that must be counted those convictions removed from a criminal record for policy reasons unrelated to innocence or an error of law." *Id.* at 911 (citing cases from the Second, Third, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits that "therefore have counted prior felony drug convictions even where those convictions had been set aside, expunged, or otherwise removed from a defendant's record for such reasons," although only the Second and Eleventh Circuits explicitly dealt with juvenile-age prior offenses); *see also United States v. Smith*, 897 F.2d 1168, 1990 WL 27146 (D.C. Cir. 1990) (unpublished opinion) (upholding § 841(b)(1)(A) enhancement using prior drug offense conviction for which defendant received probation under the D.C. Youth Rehabilitation Act because conviction qualified as "final" under statute, and citing, inter alia, *Tuten v. United States*, 460 U.S. 660 (1983) (Federal Youth Corrections Act probation sentence can enhance subsequent sentence for same offense)).

The Second Circuit has held that a conviction replaced by a youthful-offender adjudication under state law may qualify as a prior felony drug conviction for a § 841(b)(1)(A) mandatory minimum if the defendant was "[1] tried and convicted [2] in an adult court [3] of adult drug offenses [4] punishable by imprisonment for more than one year." *United States v. Jackson*, 504 F.3d 250, 253 (2d Cir.) (applying *United States v. Sampson*, discussed below, to apply ten-year mandatory minimum), *cert. denied*, 552 U.S. 1055 (2007); *accord United States v. DeJesus*, 314 F. App'x 386, 389 (2d Cir. 2009) (unpublished order) (applying *Jackson* to twenty-year mandatory minimum). And both the Second and Eleventh Circuits have held that § 841(b)(1)(A)'s twenty-year mandatory minimum enhancement could be based on prior felony drug convictions adjudicated under the New York youthful-offender statute and replaced by a "youthful offender" finding on criminal records, even if the defendant was adjudicated as a juvenile. *United States v. Sampson*, 385 F.3d 183, 194–95 (2d Cir. 2004), *cert. denied*, 544 U.S. 924 (2005); *United States v. Acosta*, 287 F.3d 1034, 1036–38 (11th Cir.), *cert. denied*, 537 U.S. 926 (2002). In each case, the court seemed more influenced by the fact that the defendant was a repeat offender than by the fact that the prior conviction was for an offense committed while a juvenile. The Second Circuit noted that youthful-offender convictions have become "final," and that, consistent with the definition of "felony drug offense" in § 802(44), the defendant at issue was "[i] tried and convicted [ii] in an adult court [iii] of adult drug 'offense[s] . . . [iv] punishable by imprisonment for more than one year[]'; [v] he served his sentence in an adult institution; and [vi] no avenue for direct appeal exists." *Sampson*, 385 F.3d at 194–95 (quoting 21 U.S.C. § 802(44)) (alterations in original). The Eleventh Circuit held that, consistent with the purposes of § 841, a guilty plea to a felony drug offense at age sixteen that was adjudicated under the New York youthful-offender law was a "conviction" that could be used to enhance the defendant's sentence for a drug conviction thirteen years later—in the same way that pleas of nolo contendere could be utilized for "convictions" even though the defendants were never adjudicated as "guilty"—despite the fact that a youthful-offender defendant was not considered convicted under state law. *Acosta*, 287 F.3d at 1036–38.

The Second and Seventh Circuits were recently presented with the question we now face, but in a posture that obviated the need to decide it. *See United States v. Deandrade*, 600 F.3d 115, 120 (2d Cir.) (rejecting challenge to district court's consideration of drug-related juvenile adjudication to trigger § 841(b)(1)(A) twenty-year mandatory minimum because Guidelines-range sentence imposed exceeded statutory sentence such that neither juvenile adjudication nor § 841 contributed to sentence), *cert. denied*, 130 S. Ct. 2394 (2010); *United States v. Williams*, 339 F. App'x 654, 658–59 (7th Cir. 2009) (unpublished order) (concluding that defendant had no basis on which to challenge his twenty-year mandatory minimum sentence because, although he had a juvenile conviction, he had "successfully avoided the life sentence by persuading the district court that one of his previous drug convictions should not count because it was a juvenile conviction obtained in a process that did not guarantee a jury trial").

of common pleas other than the juvenile court to be prosecuted as an adult. *See* OHIO REV. CODE ANN. §§ 2152.03, 2152.12[14]; *State v. Wilson*, 652 N.E.2d 196, 198–99 (Ohio 1995); *State v. West*, 856 N.E.2d 285, 288–89 (Ohio Ct. App.), *appeal denied*, 857 N.E.2d 1230 (Ohio 2006). Graham has not contended that this procedure was not properly complied with for his 1995 conviction, and we will thus presume that it was. *See Wilson*, 652 N.E.2d at 199 (holding that failure to comply with bindover procedure strips the court of common pleas of subject-matter jurisdiction over juvenile offender and that a lack of jurisdiction makes the judgment of conviction "void *ab initio*"). Graham was clearly prosecuted as an adult, he pleaded guilty, and he was "convicted" of a felony drug offense under Ohio law.

For this reason, we decline to consider whether the express inclusion of juvenile-*deliquency* adjudications in the calculus of prior convictions for the Armed Career Criminal Act ("ACCA"), *see* 18 U.S.C. § 924(e), should influence the interpretation of § 841(b)(1)(A) in this case.[15] Graham's 1995 conviction was an adult conviction, not a juvenile-delinquency adjudication. We decline to express any opinion on whether a juvenile-delinquency adjudication should qualify as a "felony drug offense" for § 841(b)(1)(A) mandatory-minimum purposes, and this remains an open question in this

---

[14]Ohio Rev. Code Ann. § 2152.03 is a recodification of § 2151.25, which was in effect at the time of Graham's 1995 conviction; § 2152.12 is a recodification of § 2151.26. Neither statute has been amended in a way that is material here.

[15]This circuit has rejected the argument that a first-offender status adjudication resulting in a sentence of probation is not a "prior conviction for a felony drug offense [that] has become final" for § 841 purposes. *See United States v. Miller*, 434 F.3d 820, 824 (6th Cir.) (upholding twenty-year mandatory minimum sentence), *cert. denied*, 547 U.S. 1086 (2006). Although *Miller* did not involve a juvenile-age first-offender adjudication, our reasoning mirrors that of our sister circuits, *see supra* n.13, who have addressed that issue:

> As the court noted in [*United States v.*] *Petros*, [747 F. Supp. 368 (E.D. Mich. 1990), *cited with approval in United States v. Hughes*, 924 F.2d 1354 (6th Cir. 1991),] the policy behind state first-offender provisions and similar alternative sentencing statutes is "to allow first offenders, who are often youthful, an opportunity to straighten themselves out on the road of life without the baggage of a drug conviction on their record" and is meant "as an incentive to learn a lesson . . . [but] is clearly not meant to provide them with a technical legal advantage if, not having learned a lesson, they continue their criminal conduct." 747 F. Supp. at 376. In the wake of continued criminal conduct, first-offender sentences are considered "prior offenses" under § 841 that become "final" at the point at which they are no longer appealable.

*Miller*, 434 F.3d at 824.

circuit.[16] We note that both the juvenile-delinquency language in the ACCA and the mandatory-life-term language in § 841(b)(1)(A) were added as part of the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, interestingly enough in consecutive sections, § 6451 and § 6452, respectively. Sections 6451 and 6452 were both part of "Subtitle N – Sundry Criminal Provisions." The close proximity of the two sections, and the express inclusion of juvenile delinquency in the ACCA with no corresponding amendment to § 841(b)(1)(A), could support an argument that juvenile-delinquency adjudications were not intended to be counted for § 841(b)(1)(A) mandatory-minimum purposes, but we are not presented with that issue in the instant case.

The Sentencing Guidelines' treatment of adult sentences imposed for offenses committed prior to a defendant's eighteenth birthday for criminal history purposes also does not influence our interpretation of the plain statutory language at issue here. We acknowledge that Graham's 1995 conviction did not add any criminal history points to the Guidelines calculation in his PSR because he was released from confinement more than five years prior to the instant offense, which reflected a proper interpretation of U.S.S.G. § 4A1.1, Application Note 2, and § 4A1.2(d), Application Note 7. However, only the temporal limits in § 4A1.2 saved Graham's 1995 conviction from fitting the definition of a prior conviction under the career-offender enhancement in § 4B1.1, which counts only prior adult felony convictions but classifies as an "adult conviction[]" "[a] conviction for an offense committed prior to age eighteen . . . if it is classified as an adult conviction under the laws of the jurisdiction in which the defendant was convicted." U.S.S.G. § 4B1.2, cmt. n.1; *see United States v. Prado*, 228 F. App'x 542, 547–48 (6th

---

[16]The Third Circuit has distinguished § 841(b) from the ACCA, holding that a juvenile-delinquency adjudication in juvenile court five years prior to the instant § 841(a) offense did not qualify as a felony drug offense "prior conviction" under the ten-year mandatory minimum in § 841(b)(1)(B). *United States v. Huggins*, 467 F.3d 359, 360–62 (3d Cir. 2006). The court distinguished the Second and Eleventh Circuits' opinions in *Sampson* and *Acosta*, respectively, because unlike the state-law procedures in those cases, Pennsylvania's juvenile-adjudication procedures did not "follow[] an adult conviction in an adult court, with the full panoply of procedural protections that come with the latter." *Id.* at 362. The court further relied on the fact that the clear language incorporating juvenile-delinquency adjudications as prior convictions under the ACCA was not included in § 841(b)(1)(B) and "it is clear that an adjudication of delinquency [under Pennsylvania law] is not the same as an adult conviction." *Id.* at 361–62.

Cir. 2007) (unpublished opinion). Unlike the Guidelines, § 841(b)(1)(A) does not include a temporal limit. Both the Eighth and Eleventh Circuits have indicated that this absence of a temporal limit suggests that no such limit should be imposed in its application. *See United States v. Hudacek*, 24 F.3d 143, 146 (11th Cir. 1994) (rejecting challenge to mandatory life term imposed with twenty-year-old prior conviction and attempted analogy to U.S.S.G. § 4A1.2); *see also United States v. Johnston*, 220 F.3d 857, 862 n.4 (8th Cir. 2000) (citing *Hudacek* to reject argument that all pre-1988 prior felonies are precluded from § 841 based on lack of notice at time of priors); *United States v. Watson*, 332 F. App'x 341, 342–43 (8th Cir. 2009) (unpublished opinion) (holding prior conviction less than fifteen years old not too dated for § 841, referencing career-offender time limits in U.S.S.G.); *United States v. Tyree*, 273 F. App'x 830, 833 (11th Cir. 2008) (unpublished opinion) (holding prior conviction more than ten years old not precluded from consideration under § 841, rejecting under plain error Fed. R. Evid. 609(b) argument). As the Seventh Circuit has stated,

> Prior convictions that affect minimum sentences are not treated like "criminal history" under the Sentencing Guidelines, which both before and after *Booker* affects the presumptive sentencing range without establishing a floor. Recidivist provisions do set floors, and judges must implement the legislative decision whether or not they deem the defendant's criminal record serious enough; the point of such statutes is to limit judicial discretion rather than appeal to the court's sense of justice.

*United States v. Canon*, 429 F.3d 1158, 1160 (7th Cir. 2005) (affirming conviction, but vacating and remanding with instructions to impose life sentence). "[W]hether or not [the Sentencing Commission's] method would be preferable for the statute and Guideline alike, it has no authority to override the statute as [the Supreme Court] ha[s] construed it."[17] *Neal v. United States*, 516 U.S. 284, 294 (1996); *see United States v. Branham*, 97 F.3d 835, 845 (6th Cir. 1996) ("[O]ur deference to the Commission's commentary ceases once we find that such commentary, and the interpretation therein, contravenes federal law." (citing *Neal*, 516 U.S. at 289, 293–94)).

---

[17]We note that the Supreme Court in *Burgess* did not opine on the use of the Sentencing Guidelines in defining what offenses constitute a "felony drug offense" for § 841(b)(1)(A).

In the absence of a new Supreme Court precedent or congressional enactment to the contrary, *see Neal*, 516 U.S. at 295, we conclude that, under Supreme Court precedent and the plain language of the statute, a sentencing court imposing a mandatory minimum under § 841(b)(1)(A) must utilize the "felony drug offense" definition in § 802(44) with reference to the state law of conviction. Here, the state chose to prosecute Graham for an adult drug offense that qualifies as a felony under state law, and we will not second-guess the state's decision. Because Graham was prosecuted and convicted of an adult drug offense that qualified as a felony under state law, the sentencing court did not commit plain error by considering Graham's 1995 conviction as a prior felony drug offense for § 841(b)(1)(A) mandatory-minimum purposes.

We also are not persuaded that this approach violates the Eighth Amendment. After oral argument and supplemental briefing in this case, the Supreme Court decided *Graham v. Florida*, — U.S. —, 130 S. Ct. 2011 (2010), in which the Court held that it was unconstitutional to impose life imprisonment without parole as the punishment for a nonhomicide offense committed by a juvenile, accepting a categorical challenge to "a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes." *Id.* at 2022–23. The defendant in the instant case, however, was an adult at the time he committed the § 841 offense for which he received the mandatory life term, and we have applied the non-categorical, circumstance-specific approach of *Harmelin* to § 841(b)(1) sentences. *See Hill*, 30 F.3d at 50–51; *cf. Graham*, 130 S. Ct. at 2023 (explaining the difference between the circumstance-specific approach applied to term-of-years sentences as in *Harmelin* and the categorical approach applied to death sentences, stating that "in addressing the question presented, the appropriate analysis is the one used in cases that involved the categorical approach, specifically, *Atkins*, *Roper*, and *Kennedy*"). As the Eleventh Circuit has noted, *Graham* "did not undermine *Harmelin* insofar as adult offenders are concerned." *United States v. Farley*, 607 F.3d 1294, 1342 n.34 (11th Cir. 2010) (holding that *Graham* did not affect the defendant's thirty-year mandatory minimum child-pornography sentence because the defendant was an adult at the time he committed the instant offense). The instant defendant is not similar to the situation that the Supreme Court addressed in

*Graham*—he is not a "juvenile offender" for purposes of the punishment he received in the instant case. *See Graham*, 130 S. Ct. at 2030 (stressing that its holding applies to "those who were below [eighteen] when the offense was committed"). We express no opinion on whether *Graham* would support finding unconstitutional a mandatory life term under § 841(b)(1) for a third-time *juvenile* felony offender. *See United States v. Scott*, — F.3d —, No. 09-2577, 2010 WL 2650709, *7 (8th Cir. July 6, 2010) ("The Court in *Graham* did not call into question the constitutionality of using prior convictions, juvenile or otherwise, to enhance the sentence of a convicted *adult*." (emphasis added)).

The Eighth Circuit has rejected an Eighth Amendment challenge similar to the one presented here, concluding that the defendant's two prior juvenile-age felony drug offenses, for which the defendant was tried and convicted as an adult, may be utilized for both triggering prior felony drug offenses for a § 841(b)(1)(A) mandatory life term imposed for a later adult offense. *Id.* at *7. The *Scott* court rejected both a gross proportionality argument under *Harmelin* and an argument that recent Supreme Court precedents relating to juveniles extended to § 841 sentences under *Roper v. Simmons*, 543 U.S. 551 (2005), and *Graham* because "[n]either . . . involved the use of prior offenses committed as a juvenile to enhance an adult conviction, as here." *Scott*, 2010 WL 2650709, *7. The Eighth Circuit distinguished *Graham* and *Roper* because the defendant did not receive the mandatory life term for the offenses he committed while a juvenile, but rather for the offense that he committed as an adult. *Id.* The Fifth Circuit has also upheld the constitutionality of using an adult conviction for a drug offense committed while a juvenile to impose the mandatory life sentence enhancement in § 841(b)(1)(A). *United States v. Mays*, 466 F.3d 335, 339–40 (5th Cir. 2006), *cert. denied*, 549 U.S. 1234 (2007). Mays was convicted of violating § 841(a) and (b)(1)(A), and he objected to the sentencing court's use of a state narcotics conviction from 1992 when he was seventeen, although he had been tried as an adult. *Id.* at 339. On appeal, Mays argued that using this juvenile-age offense violated the Eighth Amendment under *Roper*, which held that the Eighth and Fourteenth Amendments prohibit imposing the death penalty on offenders who were under the age of eighteen at time of their offense.

The Fifth Circuit rejected this argument, finding that Mays "has not proffered any evidence of a national consensus that sentencing enhancements to life imprisonment based, in part, on juvenile convictions contravene modern standards of decency," and noting that federal sentences often allow enhancements based on juvenile offenses. *Id.* at 340 (citing U.S.S.G. § 4A1.2(d)(2)).

Graham has not provided us with any information to suggest that we should not adopt the reasoning of our sister circuits and reject this further Eighth Amendment challenge. Indeed, Graham did not even attempt to rely upon the categorical reasoning in *Roper*—a case readily available to him at each level of appeal—and we do not believe that the approach of *Roper* or *Graham v. Florida* extends to the situation here.[18] Graham did not commit the instant offense while a juvenile with the "lessened culpability" that would caution us to believe that he is "less deserving of the most severe punishments." *Graham*, 130 S. Ct. at 2026 (citing *Roper*, 543 U.S. at 569); *see also id.* at 2040 (Roberts, C.J., concurring in the judgment) ("Graham's age places him in a significantly different category from the defendants in *Rummel*, *Harmelin*, and *Ewing*, all of whom committed their crimes as adults."). This is not a situation where the state failed to offer a juvenile defendant "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," *id.* at 2030 (majority opinion), or where a juvenile was "deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential," *id.* at 2032; instead, Graham was twice convicted of felony drug offenses and he re-offended thereafter, a situation in which Congress has determined that a defendant should receive a sentence of life without parole. Further, it is not clear that the Supreme Court would apply the categorical analysis utilized in *Graham* to the situation presented here—the use of an adult conviction resulting from a juvenile-age offense to enhance the punishment for an adult-age offense to life without parole, especially in light of *Harmelin*, upholding a sentence of life without parole for a first-time adult offender possessing 650 grams of cocaine.

---

[18] We note that Graham has not filed a Federal Rule of Appellate Procedure 28(j) letter to request that we consider and apply *Graham v. Florida* here.

If we are wrong in our interpretation of binding precedent, we hope that the Supreme Court will correct us.

Graham has not asserted any additional arguments not rejected above to contend that applying § 841(b)(1)(A) to juvenile-age offenses prosecuted and convicted as adult proceedings violates the Eighth Amendment.[19] For the reasons stated above, we conclude that Graham's sentence under § 841(b)(1)(A)(iii) is not unconstitutional.

## C. Reasonableness of Graham's Life Sentence

Graham argues that the district court's decision to impose a life sentence was substantively unreasonable because he asserts that the district court "failed to consider fully the sentencing factors outlined in § 3553(a) as they apply to [him]." Appellant Br. at 30; *see United States v. Moon*, 513 F.3d 527, 543 (6th Cir.) (outlining substantive errors), *cert. denied*, 128 S. Ct. 2493 (2008). Although Graham did not object explicitly on this ground at sentencing, we review all substantive arguments for abuse of discretion and reasonableness, affording a rebuttable presumption of reasonableness to a properly calculated, within-Guidelines sentence. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir.) (en banc), *cert. denied*, 129 S. Ct. 68 (2008). Graham concedes that his sentence is within the Guidelines range and entitled to a reasonableness presumption under *Vonner*, and we conclude that his substantive unreasonableness argument fails. "Even assuming that the district court abused its discretion in sentencing [Graham], remand is inappropriate. [Graham] was sentenced pursuant to a statutory mandatory

---

[19]Although Graham did not raise arguments under any other provisions of the Constitution, we note that the Tenth Circuit has rejected an argument that, because the states treat juvenile records differently, the use of the defendant's two adult convictions for juvenile-age offenses to trigger a mandatory life term under § 841(b)(1)(A) violates the Equal Protection Clause. *United States v. McKissick*, 204 F.3d 1282, 1300–02 (10th Cir. 2000). The court reasoned that "Congress intentionally left certain aspects of the § 841 enhancements to be triggered by the laws of the states," that under the § 802(13) definition of "felony" tied to state classifications the two Oklahoma felonies could trigger a § 841 mandatory life term, and that the states' differing criteria for when to charge a juvenile as an adult did not render § 841 an irrational sentencing scheme. *Id.* at 1301. Furthermore, because the defendant "was convicted as an adult," the potential different treatment between states in unsealing juvenile records was irrelevant. *Id.* at 1301. The Tenth Circuit had previously rejected a defendant's ability to contest the validity of a triggering prior felony drug offense used for a mandatory life term under the plain language of § 851—disallowing any collateral attack on the validity of a prior conviction "'which occurred more than five years before the date of the information alleging such prior conviction'"—even though the defendant argued that the prior conviction "was presumptively invalid because he was a juvenile at the time of the crime and the conviction." *United States v. Green*, 175 F.3d 822, 834–35 & n.7 (10th Cir.) (quoting 21 U.S.C. § 851(e)), *cert. denied*, 528 U.S. 852 (1999).

minimum such that on remand, 'the district court would not have the discretion to impose a shorter term of imprisonment.'" *United States v. Higgins*, 557 F.3d 381, 397 (6th Cir.) (quoting *United States v. Smith*, 419 F.3d 521, 532 (6th Cir. 2005)), *cert. denied*, 130 S. Ct. 817 (2009); *id.* at 398 (same conclusion for substantive reasonableness). Even if we construed Graham's appeal to challenge the 168-month sentence imposed for Count Six, we would conclude that it is reasonable. *Id.* at 397 (rejecting reasonableness arguments to non-mandatory-minimum sentences because term concurrent to mandatory life sentence and remand could not alter sentence). Our independent review of the sentencing transcript did not reveal any errors.

## II. CONCLUSION

The government presented sufficient evidence at trial for a reasonable jury to find beyond a reasonable doubt that Graham was guilty of the offenses charged, and the district court did not err in denying Graham's motions for a judgment of acquittal. The district court also did not err in denying Graham's motion to disregard life sentence and did not commit plain error in utilizing Graham's 1995 adult conviction for an offense committed while a juvenile, but prosecuted and sentenced in an adult proceeding, as a triggering prior felony-drug-offense conviction under 21 U.S.C. § 841(b)(1)(A). Applying state law and the definition of "felony drug offense" in 21 U.S.C. § 802(44), we conclude that Graham's 1995 offense was an adult conviction of an offense punishable by more than one year of imprisonment under state law that prohibits conduct relating to drugs, which satisfies the prerequisites to be counted as a triggering offense for a § 841(b)(1)(A) mandatory-minimum sentence. We are also unpersuaded by Graham's Eighth Amendment challenge. And we conclude that Graham's further sentencing appeal is without merit because the district court did not err in imposing Graham's statutory mandatory minimum life sentence. We therefore **AFFIRM** the district court's judgment under the facts of this case and current precedent.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting.  My view in this case of first impression in this Circuit is that the sentencing of this nonviolent, 30-year-old petty drug trafficker to life imprisonment by using a juvenile conviction as a necessary third strike not only violates clear congressional intent revealed by clear rules of statutory construction but also violates sound principles of penological policy based on the Eighth Amendment values recently outlined by the Supreme Court in *Graham v. Florida*, 130 S. Ct. 2011 (2010).  I would have preferred that my colleagues in the majority acknowledge and address the arguments made here against the use of a juvenile conviction to send this nonviolent drug offender to prison for life.  Instead they have chosen to ignore those arguments.  I leave it to the readers to determine for themselves the usefulness and credibility of this kind of appellate decision making.

Three canons of statutory construction apply here.  It is a well settled canon of statutory construction that when interpreting statutes, "[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *United States v. Choice*, 201 F.3d 837, 840 (6th Cir.2000) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  With respect to the question presented here, I find the statutory language to be unambiguous.  The plain language of the statute used to imprison Graham for life simply does not mention using juvenile convictions as predicate "prior felonies," and we should not read such an interpretation into the statute.  There is no indication; and, as will be demonstrated below, the indication is to the contrary, that Congress intended to endorse the use of juvenile convictions in this statute to enhance a defendant's sentence.

## 1. In *pari materia*

In this case we are interpreting one statute with two immediately adjacent sections that enhance the punishment for two separate federal crimes. The first section amends the "career criminal" statute dealing with violent felonies, 18 U.S.C § 924(e), and it says expressly that the punishment for violent, career criminal conduct must be increased by using convictions for juvenile conduct. The second section amends the drug law, 21 U.S.C. § 841(b)(1)(A); and, contrary to the first section, this section says only that the punishment must be increased to life imprisonment for three or more "convictions." Unlike the career criminal section immediately above it, the drug enhancement section does not specify the use of juvenile convictions.[1] Courts in three circuits have recognized the *pari materia* principle as an appropriate method of interpreting these two provisions in the statute distinguishing between the use of prior juvenile convictions. *United States v. Huggins*, 467 F.3d 359, 361 & n.2 (3d Cir. 2006); *United States v. Peyton*, No. 10-015 (RMC), — F. Supp. 2d —, 2010 WL 2308186 (D.D.C. June 10, 2010); *United States v. Ivory*, No. 04-20044-01-KHV, 2010 WL 1816236, at *3 & n.3 (D. Kan. Feb. 26, 2010).

---

[1]The statutory amendments read as follows in pertinent part:

SEC. 6451. VIOLENT FELONIES BY JUVENILES

Section 924(e) [Career Criminal Act] of title 18, United States Code, is amended . . .

(2) by adding at the end thereof the following:
"(C) the term 'conviction' includes a finding that a person has committed an act of juvenile delinquency involving a violent felony."

SEC 6452. LIFE IN PRISON FOR THREE-TIME DRUG OFFENDER.

(a) PENALTY FOR THIRD OFFENSE — Section 401(b)(1)(A) of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A)) is amended —
(1) in the sentence beginning "If any person commits" by striking "one or more prior convictions" through "have become final" and inserting "a prior conviction for a felony drug offense has become final"; and
(2) adding after such sentence the following: "If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence.

Anti-Drug Abuse Act, Pub. L. No. 100-690, §§ 6451-52, 102 Stat. 4371 (1988).

Statutes are considered to be in *pari materia* when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object. Each section of a law which deals with the same subject matter must be read in *pari materia* with other sections on the same subject. Norman J. Singer, 2A *Statutes and Statutory Construction* § 51.3 (2000 ed.). Obviously, language is in *pari materia* when in the very same statute in paragraphs placed next to each other. In view of Congress' failure to include in § 841 a definition of "prior conviction" that specifically includes convictions obtained when the defendant was a juvenile, I would rely on the canon of statutory construction that states: "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 338 (1994) (quoting *Keene Corp. v. United States,* 508 U.S. 200, 208 (1993)); *see also* Norman J. Singer, 3B *Statutes and Statutory Construction* § 75.4 (2000 ed.). This distinction between two statutory amendments passed at the same time in adjacent sections shows that Congress knew how to include a juvenile conviction when it wanted to. *See* Pub. L. No. 100-690, § 6451, 102 Stat. 4181, 4371 (1988).

My position is simply that the two adjacent sections of the same statute invoke an ancient, sensible, common law canon of statutory construction and must be read in *pari materia*.[2] Thus by specifically including juvenile convictions in the first enhancement for violent career criminals but leaving it out in the next section dealing with drugs, the statutory drafters did not intend to allow juvenile conduct resulting in a conviction to be used to enhance the punishment to life imprisonment, as my colleagues insist. I think the *pari materia* canon is clear and leads to a clear result of no increased penalty based on juvenile conduct.

Upon a moment's reflection, the reason Congress chose to treat juvenile convictions differently in the statute becomes obvious. Congress made the distinction because a pattern of *violent* conduct involving the use of *force* is more culpable than a

---

[2]See extensive discussion and acceptance of this principle in *United States v. Freeman*, 441 U.S. (3 HOW) 641, 643-44 (1845) (discussing older English cases) ("all acts in *pari materia* are to be taken together as if they were one law").

pattern of nonviolent sales of drugs that may be, as here, relatively minor in nature. The recent Supreme Court case of *Johnson v. United States*, 130 S. Ct. 1265 (2010), reinforces this view by making it clear that the conduct underlying the recidivist enhancements of the career criminal provision must be violent and involve the use of significant force rather than a mild form of battery. That is the "context" of the two different adjacent provisions – the one including juvenile convictions, the other excluding them – and as the *Johnson* case states quite logically, in statutory construction, "ultimately, context determines meaning . . . ." *Id.* at 1270 (citing *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307 (1961). If so, the "context" of the two different adjacent penalties means that juvenile convictions should not be used to enhance penalties under the drug statute.

"Context" is also the reason that a few cases have allowed the use of juvenile convictions in drug cases. In these cases, the court was not informed of the fact that the enacting statute contained, side by side, the two different penalty provisions. Counsel for the defendant did not inform the courts of this crucial fact, and the Department of Justice did not disclose it either. Perhaps we should not be too critical of the courts for not discovering the context because the federal criminal law has become exceedingly complex and convoluted during the last forty years. But once a court discovers the context, I do not see how it can simply reject the application of the *pari materia* rule.

My colleagues deal with this issue of interpretation indecisively and in a puzzling way. They simply say that the issue arises because the two contrary juvenile conviction provisions are "interestingly enough in consecutive sections § 6451 and 6452 . . . but we are not presented with that issue in the instant case." (Draft op. pp. 22-23.) That is all my colleagues have to say about the matter — that it is "not an issue." My question is "why not?"

## 2. Rule of Lenity

But even if other judges see ambiguity where I see clarity, there is another ancient, sensible canon of statutory construction that leads to the same result. Where a penalty has not been endorsed through "deliberate, express, and full legislative consideration," it should not be imposed when a reasonable alternative exists. That canon says that our constitutional philosophy of maximizing liberty over detention means that we must use a rule of lenity to prefer liberty over incarceration when in reasonable doubt as to the coverage of a criminal statute. This recent statement of the rule of lenity comes from the Supreme Court:

> Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. *See United States v. Gradwell*, 243 U.S. 476, 485 (1917); *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *United States v. Bass*, 404 U.S. 336, 347, -49 (1971). This venerable rule not only vindicates the fundamental principles that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps the courts from making criminal law in Congress's stead.
>
> . . . .
>
> When interpreting a criminal statute, we do not play the part of mindreader. In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. "[P]robability is not a guide which a court, in construing a penal statute, can safely take."

*United States v. Santos*, 553 U.S. 507, ___, 128 S. Ct. 2020, 2025-26 (2008) (parallel citations omitted).

It was an ancient rule of statutory construction that penal statutes should be "strictly construed" against the government or parties seeking to enforce statutory penalties and in favor of the persons on whom penalties are sought to be imposed. *United States v. Wiltberger*, 18 U.S. 76 (1820) ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself."). Today this

principle simply means that words are given their ordinary meaning and that any reasonable doubt about the meaning is decided in favor of anyone subjected to a criminal statute. *See generally* Norman J. Singer, 3 *Statutes and Statutory Construction* § 59 (2000 ed.) (interpretation of penal statutes).

The Supreme Court has stated explicitly that the rule of lenity in interpreting criminal statutes is particularly applicable when analyzing a statute that would increase the punishment meted out to a defendant. "The policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States*, 358 U.S. 169, 178 (1958); *United States v. Bass*, 404 U.S. 336, 348 (1971) (The rule embodies "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should."). Here the "languishing" is for life versus a much shorter prison term.

In the realm of statutory interpretation, the Court implements due process requirements through the rule of lenity, which requires courts to give criminal defendants the benefit of the doubt when criminal statutes contain ambiguity concerning the elements of an offense or its punishment. *See, e.g., United States v. Granderson*, 511 U.S. 39, 54 (1994) (applying the rule of lenity to a statutory ambiguity concerning sentencing); *Dunn v. United States*, 442 U.S. 100, 112 (1979) (explaining that the rule of lenity "reflects not merely a convenient maxim of statutory construction," but rather "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited").

From the face of the statute, there is no reason to think that "conviction" includes convictions for juvenile conduct; but, even if one believes that some ambiguity exists in the language or Congressional intent, "the tie must go to the defendant." My colleagues have nothing at all to say in response to this canon of statutory interpretation. They are simply silent in the face of a rule that goes back centuries in Anglo-American law.

**3.  Consequences**

In what seems to me my colleagues' strained effort to justify the life sentence in this case based on juvenile conduct, they take account of neither the well-established canons of statutory construction discussed above nor the social consequences of what has only recently become conventional judicial behavior favoring long prison terms for nonviolent drug offenses.  There are now numerous studies pointing out the extreme financial and social costs of the huge increase in our U.S. prison population from less than half a million in 1980 to almost two and one-half million in 2009 – a five fold increase.  *Too Many Laws, Too Many Prisons*, The Economist, July 22, 2010.  The increase in our federal prison population has been even more dramatic, increasing to 211,000 during the same time period — a ten fold increase.  U.S. Dep't of Justice, Fed. Bureau of Prisons, Quick Facts about the Bureau of Prisons (2009) (*available at* http://www.bop.gov/news/quick.jsp#4).  By comparison, on a per capita basis, we have five times more people imprisoned than Great Britain and nine times more than Germany.  The Economist, *supra*.  Out of our total prison population in the United States, 140,000 are serving life imprisonment, including 6,000 life prisoners in the federal prison system, and more than a third (37.2%) of federal drug offenders are serving mandatory minimum sentences of 10 or more years.  United States Sentencing Comm'n Annual Report for 2009 (found at http://www.ussc.gov/ANNRPT/2009/table43.pdf).

Because of long sentences, drug offenders represent more than half of the federal prison population.  U.S. Dep't of Justice, Fed. Bureau of Prisons, Quick Facts about the Bureau of Prisons (2009) (*available at* http://www.bop.gov/news/quick.jsp#4) (51% of persons in federal prisons convicted of drug violations).  As soon as one drug defendant is incarcerated for his offense, another steps into his shoes.  Long periods of incarceration have done little except drive up the costs of our correction system and perhaps appeal to our retributive instinct to be "tough on crime" in our "War on Drugs."

Penologists and other close observers of the penal system, along with budgetary experts who study the cost of our correction system,[3] call for alternatives to long periods of incarceration, including the re-invention of the parole systems to review the possibility of conditional release as prisoners reach middle and old age. Other techniques such as halfway houses, home confinement, and electronic monitoring could be employed to cut drastically the social and economic costs of long imprisonment.

The life sentence imposed in this case is not only contrary to well-established canons of statutory interpretation and has adverse social consequences for our country, it undermines longstanding constitutional values recently described in *Graham v. Florida*, 130 S. Ct. 2011 (2010), striking down life imprisonment imposed on juveniles under the Eighth Amendment.

That case should at least make our court and the court system more sensitive to the important distinction between juvenile and adult criminal conduct. The Court points out that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences":

> The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency — the remote possibility does not mitigate the harshness of the sentence.
>
> . . . .
>
> A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense. With respect to life without parole for juvenile non-homicide offenders, none of the goals of penal sanctions that have been recognized as legitimate — retribution, deterrence, incapacitation, and rehabilitation — provide an adequate justification.

---

[3] U.S. DEP'T OF JUSTICE, FY2008 BUDGET AND PERFORMANCE SUMMARY, *available at* http://www.usdoj.gov/jmd/2008summary/pdf/127_bop.pdf. As of June 2008, the annual cost of incarceration was estimated at \$24,922 per prisoner. Annual Determination of Average Cost of Incarceration, 73 Fed. Reg. 33853 (Dep't of Justice, Bureau of Prisons June 13, 2008), http://www.thefederalregister.com/d.p/2008-06-13-E8-13265. There are currently 210,774 federal prisoners (excluding those in halfway house and other facilities). U.S. DEP'T OF JUSTICE, BUREAU OF PRISONS, WEEKLY POPULATION REPORT (August 26, 2010), *available at* http://www.bop.gov/locations/weekly_report.jsp.

. . . .

> A sentence of life imprisonment without parole, however, cannot be justified by the goal of rehabilitation. The penalty forswears altogether the rehabilitative ideal. By denying the defendant the right to re-enter the community, the State makes an irrevocable judgment about that person's value and place in society.
>
> . . . .
>
> Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual.

*Id.* at 2027-30, 2032 (citations omitted). Although the holding of the case is, technically speaking, probably not binding, all of these words apply equally to the defendant, Graham, in this case as they did for the defendant, Graham, in the recent Supreme Court case.

One more point: To all of these arguments — canons of construction, good policy, constitutional values — my colleagues offer one lame defense: "Graham was convicted of juvenile drug trafficking in a state court of general jurisdiction rather than one exclusively of juvenile jurisdiction," and this "adult" conviction seems to mean to them that all arguments to the contrary are swept aside. They refer to such convictions for juvenile conduct as "adult convictions" when they really mean "juvenile convictions" in a state court of general jurisdiction. State courts differ significantly in how juvenile crime is prosecuted, and the application of federal law should not be made to turn on such random variations. The Supreme Court's recent *Graham* case does not allow its ruling to turn on such state procedural variations.

Moreover, even the Sentencing Guidelines themselves — a source of very harsh punishments in drug cases — in defining "convictions" to be used in criminal history calculations do not recognize such a distinction. Guideline § 4A1.1(b) makes it clear that such a distinction is not to be recognized when "an adult or juvenile sentence [is] imposed for an offense committed prior to the defendant's eighteenth birthday . . . ."

Thus every legitimate source of law I can find leads me to the conclusion that the courts should not count Graham's juvenile conviction as a third strike.